Slip Op. 19-59

UNITED STATES COURT OF INTERNATIONAL TRADE

<table>
<tr><td>

GUIZHOU TYRE CO., LTD.; GUIZHOU TYRE
IMPORT & EXPORT CO., LTD.,

                Plaintiffs,

and

TIANJIN UNITED TIRE & RUBBER
INTERNATIONAL CO., LTD.; WEIHAI
ZHONGWEI RUBBER CO., LTD.;

           Consolidated Plaintiffs,

v.

UNITED STATES,

                Defendant.

</td><td>

Before: Richard W. Goldberg, Senior Judge
Consolidated Court No. 18-00100

</td></tr>
</table>

## OPINION AND ORDER

[Sustaining in part and remanding in part the determinations of the Department of Commerce.]

Dated:  May 15, 2019

*Matthew P. McCullough*, Curtis, Mallet-Prevost, Colt & Mosle LLP, of Washington, D.C., for plaintiffs.

*John Tudor*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for defendant.  With him on the brief were *Joseph H. Hunt*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Franklin E. White, Jr.*, Assistant Director.  Of counsel on the brief was *Orga Cadet*, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

*Mark B. Lehnardt*, Baker Hostetler, LLP, of Washington, D.C., for consolidated plaintiff Tianjin United Tire and Rubber International Co., Ltd.

*R. Kevin Williams*, *Mark R. Ludwikowski*, *Lara A. Austrins*, Clark Hill PLC, of Chicago, IL, for consolidated plaintiff Weihai Zhongwei Rubber Co., Ltd.

Goldberg, Senior Judge:  This action arises from a challenge by plaintiffs Guizhou Tyre Co., Ltd. and Guizhou Tyre Import and Export Co., Ltd., (collectively "Guizhou") as well as consolidated plaintiffs Tianjin United Tire & Rubber International Co., Ltd. ("TUTRIC") and Weihai Zhongwei Rubber Co., Ltd. ("Zhongwei") (collectively "Plaintiffs") to certain aspects of the final results published by the Department of Commerce ("the Department" or "Commerce") of the 2015 Administrative Review of the countervailing duty order on off-the-road tires ("OTR tires") from the People's Republic of China ("PRC").  *Certain New Pneumatic Off-the-Road Tires from the People's Republic of China*, 83 Fed. Reg. 16,055 (Dep't Commerce Apr. 13, 2018) (final results) ("*Final Results*") and accompanying Issues & Decision Mem. ("I&D Mem."), *amended by Certain New Pneumatic Off-the-Road Tires from the People's Republic of China,* 83 Fed. Reg. 32,078 (Dep't Commerce Jul. 11, 2018) (am. final results) ("*Amended Final Results*").  Guizhou filed a motion for judgment on the agency record, Pls'. Mot. for J. on Agency R., ECF No. 25 (Sept. 21, 2018) ("Pls.' Br."), challenging Commerce's *Amended Final Results* with respect to: (1) Commerce's benchmark calculations to determine the extent of subsidies received by Guizhou; (2) Commerce's application of adverse facts available in finding use and benefit from the Export Buyer's Credit Program; and (3) Commerce's decision to countervail the Processing Trade Program.  TUTRIC and Zhongwei have adopted and incorporated the challenges brought by Guizhou.  TUTRIC Mot. for J. on Agency R., ECF No. 28 (Oct. 12, 2018); Zhongwei Mot. for J. on Agency R., ECF No. 29 (Oct. 14, 2018).

For the reasons discussed below, the court remands the Department's findings with respect to the adverse inference applied to the Export Buyer's Credit Program, sustains and remands in part the Department's benchmark calculations, and sustains the Department's decision to countervail the Processing Trade Program.

## **BACKGROUND**

In November 2016, Commerce initiated a review of the countervailing duty order on certain OTR tires from the PRC based upon timely requests from interested parties during the period of review between January 1, 2015 and December 31, 2015. *Antidumping and Countervailing Duty Administrative Reviews*, 81 Fed. Reg. 78,778 (Dep't Commerce Nov. 9, 2016) (initiation). Mandatory respondent Guizhou, as well as the Government of China ("GOC"), responded to the Department's initial and supplemental questionnaires. GOC Initial Questionnaire Resp., ECF No 38, J.A. Tab 11 (May 4, 2017) ("GOC Initial Questionnaire Resp."); Guizhou Initial Questionnaire Resp., J.A. Tab 10 (May 4, 2017) ("Guizhou Initial Questionnaire Resp."); GOC First Supp. Resp., J.A. Tab 12 (June 26, 2017) ("GOC First Supp. Resp."). Commerce also conducted a verification of Guizhou's questionnaire responses in December 2017. Verification of the Questionnaire Resps. of Guizhou, J.A. Tab 13 (Feb. 1, 2018) ("Verification Report").

In October 2017, Commerce issued its preliminary results from the administrative review based on the parties' questionnaire responses. *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China*, 82 Fed. Reg. 46,754 (Dep't Commerce Oct. 6, 2017) (prelim. results) ("*Preliminary Results*") and accompanying Prelim. Decision Mem., J.A. Tab 1 (Oct. 2, 2017) ("PDM"). In its preliminary findings, the Department determined that: (1) the Export Buyer's Credit Program was countervailable based on an adverse inference that Guizhou used and benefited from the program, PDM at 14–17; (2) the Processing Trade Program was countervailable because the GOC failed to demonstrate that it had a system or procedure in place to determine the quantity of natural rubber, synthetic rubber, carbon black, and nylon cord Guizhou consumed in the production of OTR tires, *id*. at 35–36; (3) there was "no basis to find

the domestic synthetic rubber market to be distorted," *id.* at 25; and (4) benchmarks for synthetic

rubber, natural rubber, carbon black, and nylon cord inputs appropriately included actual ocean

freight and import duty costs, *id.* at 33–35. As to the Export Buyer's Program, Commerce

applied adverse facts available ("AFA") to countervail the program because the GOC allegedly

refused to answer Commerce's questions regarding the operation of the program. *Id.* at 14–17.

The Department's final decision largely echoed its preliminary findings. Commerce

continued to find that the market for synthetic rubber was not distorted during the period of

review. I&D Mem. at 10–12. Commerce also employed both Tier 1 and Tier 2 benchmarks in

relation to certain less-than-adequate remuneration ("LTAR") findings for synthetic and natural

rubber (Tier 1), carbon black (Tier 2), and nylon cord (Tier 2). *Id.* at 12–13. These benchmarks

included ocean freight and import duties. Additionally, Commerce applied an adverse inference

to find that Guizhou used and benefited from the Export Buyer's Credit Program and concluded

that "the record does not support finding non-use of the [Program]." *Id.* at 14. Finally,

Commerce concluded that Guizhou received a countervailable subsidy from the Processing

Trade Program because "the record [did] not support a finding that the GOC has an effective

system in place to confirm which inputs are consumed in the production of exported products

and in what amounts." *Id.* at 17. This finding was based on the GOC's alleged failure to

"explain or document how it determined the quantity of rubber, nylon cord or carbon black

consumed in the production process of OTR [t]ires." *Id.* at 16. In the *Amended Final Results*,

Commerce assigned Guizhou a countervailable subsidy rate of 31.48%. *Amended Final Results*,

83 Fed. Reg. at 32,078. Commerce assigned this same rate to the "non-selected companies," *id.*,

which included TUTRIC and Zhongwei, *id.* at 32,079.

Guizhou's motion for judgment challenges each of Commerce's findings above. *See generally* Pls.' Br. For the reasons discussed below, the court sustains in part and remands in part Commerce's *Amended Final Results*.

## JURISDICTION AND STANDARD OF REVIEW

The court exercises jurisdiction to hear this appeal under 28 U.S.C. § 1581(c). The court will sustain Commerce's determination unless the court concludes that the determination is "unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence amounts to "more than a mere scintilla" of evidence. *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 477 (1951). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* Moreover, the substantiality of evidence is evaluated "on the record as a whole, including [any evidence that] fairly detracts from its weight." *Target Corp. v. United States*, 609 F.3d 1352, 1358 (Fed. Cir. 2010) (internal quotation marks and citation omitted). In other words, "substantial evidence" "can be translated roughly to mean 'is [the determination] unreasonable?'" *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006).

## DISCUSSION

Plaintiffs raise challenges to the Department's determinations regarding: (1) the PRC's Export Buyer's Credit Program (the "Export Program"); (2) the Department's calculation of benchmarks measuring adequate remuneration for synthetic rubber, carbon black, and nylon cord; and (3) the PRC's Processing Trade Program as a countervailable subsidy. The court sustains Commerce's decision to countervail the Processing Trade Program. For the remaining issues raised by Plaintiffs, the court sustains and remands in part, pursuant to the below.

I.      **China Export Import Bank Buyer's Credit Program**

As in the 2014 Administrative Review,[1] it is the Department's failure to identify a gap in

the record that proves fatal to its application of AFA.  Commerce's finding that "the record does

not support [] non-use," I&D Mem. at 14, is itself unsupported by substantial evidence because

the *only* evidence on the record supports non-use.  *See* Guizhou Initial Questionnaire Resp. at 55,

ex. I39.  Further, because Commerce failed to explain *what* information the GOC has failed to

provide and *how* that information was required for verification of the respondent's claims and

declarations demonstrating non-use of the Export Program, Commerce's finding that the GOC

did not provide information necessary to develop a complete understanding of the program was

not supported by substantial evidence.

In its review, Commerce examined whether Plaintiffs potentially benefited from the

PRC's Export Program, which provides loans to foreign companies to promote the export of

Chinese goods.  *See Antidumping and Countervailing Duty Administrative Reviews*, 81 Fed. Reg.

78,778 (Dep't Commerce Nov. 9, 2016) (initiation).  Commerce issued several questionnaires to

the respondents seeking information regarding the Export Program, and both Guizhou and the

GOC responded that none of Guizhou's customers used the Program.  Guizhou Initial

Questionnaire Resp. at 54–55; GOC Initial Questionnaire Resp. at 139–140.  Guizhou also

submitted affidavits from its United States customers confirming non-use as exhibits to the initial

---

[1] The Export Program was also challenged in the previous administrative review, where Guizhou brought substantially similar challenges (based on similar findings) before this court.  *Certain New Pneumatic Off-the-Road Tires from the People's Republic of China*, 82 Fed. Reg. 18,285 (Dep't Commerce Apr. 18, 2017) (final results) and accompanying Issues & Decision Mem. (Apr. 12, 2017).  Echoing the challenge presented here, Guizhou disputed the Department's application of AFA in determining use of the Export Program.  There, the court ordered that the Department reconsider its decision to apply AFA as to the Export Program, and further ordered that the Department take into account Guizhou's and the GOC's submitted evidence of non-use. *Guizhou Tyre Co. v. United States*, 42 CIT __, 348 F. Supp. 3d 1261 (2018).

questionnaire responses.  *See* Guizhou Initial Questionnaire Resp. at 54, ex. I38; *see also id.* at

55, ex. I39.  In a subsequent questionnaire response concerning the operation of the Export

Program, the GOC responded that the "question [was] not applicable" because "none of the U.S.

customers of the respondents used the Expert Buyer's Credit from [Export-Import] Bank during

the [period of review]."  GOC First Supp. Resp. at 10–11.  Nonetheless, Commerce determined

in its preliminary results that the GOC both withheld requested information and significantly

impeded the proceeding such that the Department applied an AFA rate for each respondent based

on Plaintiffs' alleged benefit from the Export Program.  PDM at 15–16 (citing, *inter alia*, 19

U.S.C. 1677e(a)(2)(A), (C)).  In its *Final Results*, Commerce continued to apply the AFA

because it was "without a complete and verifiable understanding of the program's operation."

I&D Mem. at 15.

     Commerce may select from facts otherwise available when necessary information is not

available in the record or when a party to a proceeding: (A) withholds information that is

requested; (B) fails to provide such information in the form and manner requested; (C)

significantly impedes a proceeding; or (D) provides information which cannot be verified.  19

U.S.C. § 1677e(a).  Once it has identified a basis under § 1677e(a), the Department may then

select from facts available in a matter adverse to the respondent—that is, apply AFA—only if the

gap in the record was caused by a failure of a respondent to cooperate to the best of its ability.

19 U.S.C. § 1677e(b).  Therefore, before Commerce can apply AFA, it must first determine

under § 1677e(a) that information is missing from the record *and* that the gap was caused by a

respondent's failure to cooperate.  Once again, Commerce missed the mark and applied AFA to

the Export Program without first establishing the statutory prerequisites of such a determination.

Here, upon requests from Commerce, Guizhou indicated it did not benefit from the

Program and provided declarations from its U.S. customers stating as much. *See* Guizhou Initial

Questionnaire Resp., at 54, ex. I38. The GOC also informed Commerce that it "contacted the

responding companies to ask for their customer lists" and the GOC confirmed that "no listed

importers of the respondent companies obtained any Export Buyers Credits from [the Export-

Import Bank]," indicating that the importers did not use the Program. GOC Initial Questionnaire

Resp. at 140. Additionally, in its supplemental questionnaire responses, the GOC further

confirmed that Plaintiffs received no benefit from the program. GOC First Supplemental Resp.

at 11. Despite this, Commerce sought information on the operation of the Export Program—a

program which all record evidence indicated Plaintiffs did not use. Based upon the GOC's non-

compliance with this final, unrelated request, Commerce applied AFA. Because the findings

underlying Commerce's application of AFA are unsupported by substantial evidence, the court

cannot sustain the ultimate AFA determination. *See also Changzhou Trina Solar Energy Co. v.*

*United States*, Slip Op. 18-167, 2018 WL 6271653, at *3 (CIT Nov. 30, 2018) ("Commerce does

not point to information on the record that allows Commerce to reasonably conclude, even with

appropriate adverse inferences, that [the plaintiff] used [the Export Program].").

Specifically, Commerce did not explain what additional information was necessary to

assess the GOC's claim of non-use, and why other information available in the record (and

provided by the parties) was insufficient to fill whatever gap was left by the GOC's non-

compliance. *Changzhou Trina Solar Energy Co. v. United States*, 42 CIT __, __, 352 F. Supp.

3d 1316, 1327 (2018). In any review, the Department must consider record evidence that "fairly

detracts" from its ultimate determination. *See CS Wind Viet. Co. v. United States*, 832 F.3d

1367, 1373 (Fed. Cir. 2016). Instead, Commerce concluded that "the record does not support

finding non-use of the [Program] by Guizhou Tyre." I&D Mem. at 14. In so doing, however,

the Department blatantly ignored the eighty-five U.S. customer declarations that were submitted

as exhibits to Guizhou's questionnaire responses, each of which stated that the customers "did

not finance [their] purchases through either the use of the . . . export buyer's credit program or

any other Chinese banks' export buyer's credit program." *See* Guizhou Initial Questionnaire

Resp. at 55, ex. I39. The Department contends that the "GOC has not provided the requested

information and documentation necessary for Commerce to develop a complete understanding of

this program" and therefore, "absent [this] information, the GOC's claims that the respondent

companies did not use this program are not verifiable." I&D Mem. at 14. But more than just

uncorroborated claims, Guizhou stated that it, first, "confirmed non-usage" by "contact[ing] all

of its export customers and confirm[ing] that none of them applied for, used, or benefited from

this program during the POR," and second, by "contact[ing] all of its unaffiliated export

customers in the United States in 2015 and inquir[ing] whether the companies used the export

buyer's credit program or otherwise received credit facilities from EXIM." *See* Guizhou Initial

Questionnaire Resp. at 55. The corresponding U.S. declarations then *affirmed* those claims made

by Guizhou. The Department's contention that non-use is unverifiable is simply not supported

by the administrative record—which, as it stands, "fairly detracts" from Commerce's

unsubstantiated finding of countervailability and benefits conferred, *CS Wind Viet. Co.*, 832 F.3d

at 1373. Indeed, not only has the Department failed to account for evidence pointing to the

contrary, Commerce has also failed to provide "more than a mere scintilla" of evidence to

support its finding that it was unable to determine that Guizhou did not use the Export Buyer's

Credit Program. *PAM, S.p.A. v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009).

Commerce attempts to (unsuccessfully) fall back on its claim that in order to "verify the accuracy of the respondents' claimed non-use of the program," Commerce needs "supporting information and documentation" from "EX-IM Bank, as the lender" to "fully understand the operation of the program."  I&D Mem. at 14.  There are two glaring problems with this finding. First, Commerce did not explain why the information that *was* provided—Guizhou's and the GOC's responses and accompanying declarations—was unverifiable on its own.  The Department had the tools at its disposal to substantiate the accuracy of the declarations—and it had to try to do so before claiming that the record evidence is unverifiable.  Second, it is unclear how or why the information about the program's operations are even necessary to verify Guizhou's claims of non-use.  *See Changzhou Trina Solar Energy Co.*, 352 F. Supp. 3d at 1326–27 ("Commerce, however, did not explain why the GOC's failure to explain this program was necessary to assess claims of non-use and why other information accessible to respondents was insufficient to fill whatever gap was left by the GOC's refusal to provide internal bank records.").  Commerce did not identify what information about the Export Program's operations would have the tendency to prove (or disprove) Guizhou's allegation of non-use.[2]  Through the fog and mist, what is clear to the court is that Commerce's determination—that information about the program's operations is "missing" from the record and is integral to Commerce's countervailability findings—is unsupported by substantial evidence on the record and therefore, not in accordance with the law under 19 U.S.C. § 1677e(a).

And finally, we are left with Commerce's misunderstanding of basic AFA principles. Once again, as in *Changzhou*, *Guizhou I*, and *Clearon*, the court is puzzled by Commerce's

---

[2] Perhaps, as the court previously opined, Commerce is "curious as to the inner workings of many Chinese programs."  *Clearon Corp. v. United States*, 43 CIT __, __, 359 F. Supp. 3d 1344, 1360 (2019).  But once again, "mere curiosity is not enough."  *Id*.

immediate jump to AFA without first explaining how information it claims to be missing or

unverifiable regarding the Program's operations leads to an adverse inference that the

respondents used the program.  For any use of facts otherwise available with an adverse

inference, "Commerce must still explain what information is missing and what adverse

inferences reasonably lead[] to its conclusion." *Nippon Steel Corp. v. United States*, 337 F.3d

1373, 1382 (Fed. Cir. 2003).  The Department's anemic reasoning to support its decision flunks

this standard under § 1677e(b) and it will not be sustained by the court.

As it stands, Commerce's decision to find the Export Program countervailing as a benefit

conferred on Guizhou was based on an improper application of §§ 1677e(a) and (b).  Commerce

cannot readily identify any material information missing from the record, and Guizhou and the

GOC provided responses to the Department's questionnaires constituting evidence of non-use of

the Export Program.  Commerce must explain why the evidence as currently provided by the

respondents was insufficient and could not have been verified by Commerce as it stands.

## II.     Calculation of LTAR Benchmarks

Plaintiffs raise several challenges to the Department's calculation of benchmarks

measuring whether adequate remuneration was paid for synthetic rubber, natural rubber, carbon

black, and nylon cord.  First, Guizhou argues that the Department failed to use the proper

benchmark to determine the extent of the subsidy received by Guizhou with regard to synthetic

rubber.  Specifically, Guizhou urges the court to compel Commerce to further provide an

explanation for its change in position from its 2014 Administrative Review on market distortion

for synthetic rubber.  Second, Guizhou argues that Commerce's failure to adjust the input

benchmarks to reflect market conditions—including domestic production of the inputs—was not

supported by substantial evidence.

### A. Legal Framework

A countervailable subsidy exists where: (1) a financial contribution is provided, (2) a benefit is thus conferred, and (3) the subsidy is specific. *See* 19 U.S.C. § 1677(5).  When a financial contribution is provided through goods or services, the statute defines a benefit as arising where goods or services "are provided for less than adequate remuneration."  19 U.S.C. § 1677(5)(E)(iv).  The adequacy of remuneration "shall be determined in relation to prevailing market conditions for the good or service being provided" in the country that is subject to review.  19 U.S.C. § 1677(5)(E).  Usual market conditions comprise of "price, quality, availability, marketability, transportation, and other conditions of purchase or sale."  19 U.S.C. § 1677(5)(E).

Commerce employs a hierarchical framework to measure the adequacy of remuneration. *See* 19 C.F.R. § 351.511.  In a Tier 1 benchmark, Commerce typically compares the price the government sold the goods or service to the respondent with a market-determined price in the country in question.  19 C.F.R. § 351.511(a)(2)(i).  By contrast, a Tier 2 benchmark, employed when market prices are not accessible, allows Commerce to "compar[e] the government price to a world market price where it is reasonable to conclude that such price would be available to purchasers in the country in question."  19 C.F.R. § 351.511(a)(2)(ii).  If a world market price cannot be used, then Commerce will "measure the adequacy of remuneration by assessing whether the government price is consistent with market principles."  19 C.F.R. § 351.511(a)(2)(iii).  This is a Tier 3 benchmark.  *See Zhaoqing New Zhongya Aluminum Co. v. United States*, 37 CIT __, __, 929 F. Supp. 2d 1324, 1327 (2013) (concluding that Commerce's decision to use Tier 2 "world market" pricing only after determining that Tier 1 pricing is

"unusable" is part of a "reasonable benchmark" calculation and "is well grounded in the applicable regulations.").

To measure the adequacy of remuneration for carbon black and nylon cord, Commerce used a Tier 2 benchmark, PDM 24–25; for natural and synthetic rubber, Commerce used Tier 1 benchmarks. PDM at 25–26.

### B.  Market Distortion for Synthetic Rubber

Commerce found that the synthetic rubber market in the PRC was not distorted during the period of review.  Therefore, Commerce used Tier 1 benchmarks for imports to measure the adequacy of remuneration for this input.  Plaintiffs challenge Commerce's distortion findings, arguing that the Department failed to distinguish its findings of lack of distortion in this review from its finding in a prior administrative review where the synthetic rubber market was distorted.

Where available, Commerce "prefers to compare prices to actual transactions in the country in question." *Maverick Tube Corp. v. United States*, 857 F.3d 1353, 1358 (Fed. Cir. 2017) (citing 19 C.F.R. § 351.511(a)(2)(i)).  But if the market in that country is distorted by government involvement—such that the "government provider constitutes a majority or . . . a substantial portion of the market," *Countervailing Duties*, 63 Fed. Reg. 65,348, 65,377 (Dep't Commerce Nov. 25, 1998) (final rule)—the prices "may no longer be concluded the result of a 'competitive' market-pricing mechanism." *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 39 CIT __, __, 61 F. Supp. 3d 1306, 1327 (2015), *aff'd sub nom. Maverick Tube Corp.*, 857 F.3d 1353.  At that point, the Department will then "consider the prices paid in that country as not an appropriate basis of comparison . . . and will instead look to world market prices." *Maverick Tube Corp.*, 857 F.3d at 1358.

Commerce found that the market in the PRC for synthetic rubber was not distorted by government presence in the market. PDM at 25 (sustained in IDM at 6, 10–12). Plaintiffs dispute this finding as inconsistent with Commerce's distortion findings from the 2014 Administrative Review, where the Department found that the market *was* distorted by government presence "on a nearly identical set of facts," Pls.' Br. at 9. *See Certain New Pneumatic Off-the-Road Tires From the People's Republic of China*, 82 Fed. Reg. 18,285 (Dep't Commerce Apr. 18, 2017) (final results) and accompanying Issues and Decision Mem. at 13. The market distortion findings for synthetic rubber in the 2014 and 2015 Administrative Reviews are distinguished by a few percentage points: a 2.03% decrease from 2014 to 2015 in the percentage of GOC production; 3.65% decrease from 2014 to 2015 in the GOC production percent of consumption; 10.50% increase from 2014 to 2015 in the import percent of production; and a 6.04% increase from 2014 to 2015 in the import percent of consumption, Pls.' Br. at 9–10.

Although Commerce attempts to justify its finding in the 2015 review as based on a "significant[]" change "between 2014 and 2015," IDM at 11–12, the small percentage shifts listed above suggest otherwise. Additionally, as Plaintiffs assert, Commerce's explanation does little to provide support for its finding that synthetic rubber was not distorted. For example, the *Final Results* explain that the "significant[]" change between the two administrative reviews are reflected by the GOC's "decreased [] volume of [] synthetic rubber production by 8.7%" and the 33.36% increase in the volume of imports overall. *Id.* at 12. But that provides little analysis as to how these changes affected the Department's distortion calculation. And Commerce's analysis of market distortion from the agency record provides no further insight into Commerce's finding, as it simply charts the input data that was provided by GOC's initial

questionnaire responses.  *See Market Distortion Mem. from Jun Jack Zhao to Tom Gilgun*, J.A.

Tab 3 (Oct. 2, 2017).

　　Both Plaintiffs and the court are left, then, to take Commerce at its word regarding its

distortion findings.   But Commerce is required to "examine the relevant data and articulate a

satisfactory explanation for its action including a 'rational connection between the facts found

and the choice made.'" *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*,

463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168

(1962)).   Commerce's barebones explanation does no such thing and leaves the parties with an

arbitrary decision, particularly in light of the fact that similar input data points from the 2014

Administrative Review compelled a contrary finding.  *Dongbu Steel Co. v. United States*, 635

F.3d 1363, 1371 (Fed. Cir. 2011) ("We have indicated that an agency action is arbitrary when the

agency offers insufficient reasons for treating similar situations differently.").

　　In its briefing, the Government explains the "gap" between its distortion conclusion and

the data presented, noting that "[b]ecause substantial government involvement in the market

likely would have suppressed the share of imports of synthetic rubber as a portion of

consumption in China, the high level of imports is reasonably indicative of limited government

involvement in the market, and therefore of a market that is not distorted."  Def.'s Br. at 12–13.

The Government's "*post hoc* rationalizations"—as articulated in its brief—cannot be used to

support the underlying determination.[3]  *Burlington Truck Lines*, 371 U.S. at 168; *see also Sec. &

Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 87 (1943) ("The grounds upon which an

---

[3] The court relies only on the administrative record to determine whether the Department's
findings are supported by substantial evidence; however, this is precisely the type of analysis
that—if supported by substantial evidence on the administrative record—may have cogently
justified the Department's distortion findings.

administrative order must be judged are those upon which the record discloses that its action was

based."). "The court restricts its review to matters found in the Final Determination"—that is,

the grounds invoked at the agency level in the preliminary memorandum and the Issues and

Decisions memorandum—and "does not consider such *post hoc* rationales for an agency's

decision," *Altx, Inc. v. United States*, 25 CIT 1100, 1103 n.5, 167 F. Supp. 2d 1353, 1359 n.5

(2001).

Therefore, on remand, the court orders Commerce to reconsider its findings and upon

reconsideration specifically explain how the market for synthetic rubber in the PRC changed

between 2014 and 2015 and what aspects of those changes caused Commerce to find that the

market was not distorted in 2015.

### C. Market Condition Adjustments

Commerce used Tier 1 benchmarks to measure the adequacy of remuneration for natural

and synthetic rubber, and Tier 2 benchmarks for carbon black and nylon cord. Plaintiffs dispute

the Department's calculations because, they claim, Commerce did not adjust the benchmarks to

reflect prevailing market conditions in the PRC—specifically, the extent to which the market is

served by domestic inputs. Here, the Department has made an AFA finding that the domestic

suppliers of the four inputs purchased were government "authorities," and were inappropriate

comparatives for benchmark calculations. Based on this underlying finding, the Department's

resultant benchmark findings are reasonable and supported by substantial evidence.

Where goods are provided for less than adequate remuneration, a benefit is treated as

"conferred upon the recipient" and it is up to Commerce to calculate the benefit received. *TMK

IPSCO v. United States*, 40 CIT __, ___, 179 F. Supp. 3d 1328, 1344 (2016). Section

1677(5)(E)(iv) provides that, once a good or service is deemed a "benefit," the adequacy of

remuneration "shall be determined in relation to prevailing market conditions for [that] good or

service." 19 U.S.C. § 1677(5)(E)(iv).  A "prevailing market condition" may include "price,

quality, availability, marketability, transportation, and other conditions of purchase or sale," *id*.,

and the adequacy of the remuneration must be "adjust[ed] . . . to reflect the price that a firm

actually paid or would pay if it imported the product," 19 C.F.R. § 351.511(a)(iv).  And as

iterated above, "Commerce's regulations provide that the agency shall measure the adequacy of

remuneration by comparing the government price to a multi-tiered series of benchmark prices."

*Nucor Corp. v. United States*, 42 CIT __, __, 286 F. Supp. 3d 1364, 1371 (2018).

     Guizhou is correct that delivery adjustments "are not without limit."  Pls.' Br. at 13.

Commerce is required to make adjustments to its LTAR benchmarks in line with the statute and

the regulations; however, in terms of implementation, "Commerce has broad discretion to

determine how to adjust the world market benchmark price to reflect delivery charges . . . so long

as such adjustments are reasonable." *TMK IPSCO v. United States*, 41 CIT __, __, 222 F. Supp.

3d 1306, 1320 (2017).  Here, because the Department's calculation was contingent on an AFA

finding, the court reviews Commerce's application of the Tier 1 and Tier 2 benchmarks for the

Department's conformance with 19 U.S.C. § 1677e.  The court upholds the finding that the

input's producers are "authorities" within the meaning of section 771(5)(B) of the Act because

Commerce's application of AFA was reasonable.

     Guizhou asserts that Commerce should have adjusted the benchmarks for ocean freight

and import duties to account for China's domestic supply of the inputs.  Pls' Br. at 15.

Prevailing market conditions, Guizhou continues, should account for the fact that some of the

input imports "are but a small fraction of deliveries in the Chinese market." *Id*.  However,

integral to its LTAR determinations, the Department explained that because it found that the

GOC "did not act to the best of its ability to comply with [its] request for information regarding ownership and control of the producers that supplied inputs to respondents," it concluded that the domestic suppliers of the inputs purchased were "authorities," pursuant to the definition provided by 19 U.S.C. § 1677(5)(B).  I&D Mem. at 11.  Ultimately, then, the Department's decision to omit evidence of the PRC's domestic supply of the inputs was contingent on its AFA finding that the supplying producers were authorities.  To this integral finding, Guizhou provides no substantive response.

In its preliminary determination, Commerce explained its use of facts otherwise available to infer that "all of Guizhou Tyre's supplying producers are 'authorities.'" PDM at 24.  For example, in calculating an appropriate benchmark for all four inputs, the Department noted that "the GOC did not act to the best of its ability to comply with the Department's request for information with regard to ownership and control of the producers that supplied the input to respondent." *Id.*  Therefore, the Department concluded, "none of the respondent's domestic purchases of the input is appropriate for benchmarking." *Id.*  This makes sense: Commerce is tasked with measuring the adequacy of remuneration by comparing the government price to a hierarchy of benchmarked prices.  During the administrative review (and then again in this litigation), Guizhou offers the Department a "supply ratio" "solution" to the benchmark adjustment, which would apportion the adjustments to the share of the market attributed to imports.  Pls.' Br. at 15.  But because that ratio would include Guizhou's domestic purchases— *which were found to be an inappropriate comparative for benchmarking*—their inclusion would distort the benchmark analysis.  This same analysis was echoed in the Department's *Final Results*: in light of the AFA finding that the domestic producers of the inputs are authorities,

Commerce only used import prices (for synthetic rubber, for example), to calculate a Tier 1

benchmark, and not its domestic prices.  I&D Mem. at 13.

The court does not generally presume the reasonableness of the AFA determination.

However, Guizhou does not adequately address Commerce's conclusion that the supplying

producers were "authorities" in its briefing, dismissing this AFA finding as "say[ing] nothing

about the benchmark calculation."  Pls.' Reply Br. In Support of Mot. for J. 9, ECF No. 37 (Jan.

18, 2019).  Nor did Plaintiffs actually dispute the application of AFA to the LTAR calculations

in its case briefs to the Department during the administrative review.  Commerce may use AFA

if the gap in the record was caused by the failure of the respondent to cooperate to the best of its

ability.  *JSW Steel Ltd. v. United States*, 42 CIT __, ___, 315 F. Supp. 3d 1379, 1382 (2018)

(citing 19 U.S.C. § 1677e(a)(2)(A)–(D)).  However, there is no indication—either in the record

or briefed by the parties—that the Department's AFA finding was not properly applied.  Indeed,

Guizhou had the opportunity to dispute the AFA finding and chose not to do so.  *See Fuwei*

*Films (Shandong) Co. v. United States*, 35 CIT 1229, 1230–31, 791 F. Supp. 2d 1381, 1384–85

(2011) (failure to challenge issue before Commerce leaves court without a record to review on

the issue).  Based on the underlying premise that domestic purchases of the inputs are

inappropriate for benchmarking, the Department's finding was supported by substantial

evidence.

### III.    Processing Trade Program

Commerce investigated import duty and VAT exemptions on imports of raw materials

from the Processing Trade Program and concluded that the program provided countervailable

subsidies.  Plaintiffs dispute these findings as unsupported by substantial evidence and contrary

to law.  The court upholds the Department's determination as to the Processing Trade Program as supported by substantial evidence drawn from the record.

     The regulatory scheme under 19 C.F.R. § 351.519(a)(1)(i) requires respondents to demonstrate that the foreign government has a reasonable system or procedure in place to confirm which inputs are consumed in the production process and in what amounts.  Under the regulation, "a benefit exists to the extent that the exemption extends to inputs that are not consumed in the production of the exported product."  19 C.F.R. § 351.519(a)(1)(ii).  In analyzing whether a program for exemption of import charges upon export results in a countervailable benefit, Commerce is to consider whether the government in question "maintains controls adequate to ensure that any remission or exemption of import duties does not extend to duties on inputs not consumed in production for export."  *GGB Bearing Tech. (Suzhou) Co. v. United States*, 41 CIT __, __, 279 F. Supp. 3d 1233, 1241–42 (2017).   Commerce will find import duty exemptions to be countervailable unless the government has a specifically delineated procedure "to confirm which inputs are consumed in the production of the exported products and in what amounts, and the system or procedure is reasonable, effective for the purposes intended, and is based on generally accepted commercial practices in the country of export."  19 C.F.R. § 351.519(a)(4)(i).  Alternatively, even where the government does not have in place a system or procedure to confirm input consumption, Commerce may find these schemes to not be countervailable if the "government in question has carried out an examination of actual inputs involved to confirm which inputs are consumed in the production of the exported product, and in what amounts."  19 C.F.R. § 351.519(a)(4)(ii).  Here, Commerce found that the GOC did not sufficiently address Commerce's questions about the Processing Trade Program, and thus

applied an adverse inference when it found the exemptions provided under the Program to be countervailable.  PDM at 35–36; I&D Mem. at 16–17.

Plaintiffs now dispute the Department's finding that the exemptions provided under the program were countervailable.  This issue was also raised in the 2014 Administrative Review and was previously discussed in detail by the court.  *Guizhou Tyre Co.*, 348 F. Supp. 3d at 1268.  Plaintiffs raise largely the same claims today.  First, Guizhou argues that it submitted detailed records as to unit consumption of raw materials, receipt of raw materials under the program, re-export of goods produced from those raw materials, and any entry of such materials into the domestic market.  Pls.' Br. at 34.  According to Guizhou, the Department ignored these submissions during its review when it countervailed duty exemptions on the premise that the Program failed to satisfy the requirements under 19 C.F.R. § 351.519(a)(4)(i).  Second, Guizhou argues in the alternative that the submitted records can also demonstrate that the GOC has "carried out an examination of actual inputs involved to confirm which inputs are consumed in the production of the exported product, and in what amounts," pursuant to section 351.519(a)(4)(ii).  *Id*. at 37.

As before, when prompted to explain how the GOC determined the quantity of the materials consumed in the production process, the GOC first referred Commerce to the Customs Measure, attached as Exhibit E.7 to its questionnaire response.  GOC Initial Questionnaire Resp. at 97.  As to Guizhou specifically, the GOC referred Commerce to "Guizhou Tire's response for a more comprehensive response and for sample documentation supporting its explanation."  *Id*. at 98.  But again, as before, these generic responses concerning consumed materials in the production falls short of demonstrating how the GOC determines the quantity of the inputs consumed in the production process: rubber, nylon cord, and carbon black.  And that is precisely

what Commerce focused on in its *Final Results*: that the GOC failed to "specifically explain or document how it determined the quantity of rubber, nylon cord or carbon black consumed in the production process." I&D Mem. at 16. Moreover, it was not unreasonable for Commerce to find that even Guizhou's questionnaire responses failed to indicate that the GOC has the requisite system or procedure in place. Guizhou stated first that at the time of the application, it "was not legally obligated to report the unit consumption to the Customs for the record." Guizhou Initial Questionnaire Resp. at 22. Guizhou's continued response outlined the general process of unit consumption verification ("[t]o verify the authenticity and accuracy of unit consumption, Customs . . . examine[d] the supporting documents and conduct an on-site inspection," *id*.), but certainly, the Department maintains discretion "and 'authority to determine the extent of investigation and information it needs.'" *Polyethylene Retail Carrier Bag Comm. v. United States*, 29 CIT 1418, 1433, 2005 WL 3555812, at *12 (2005) (citing *PPG Indus., Inc. v. United States*, 978 F.2d 1232, 1238 (Fed. Cir. 1992)).

The same goes for the Department's decision to discount verification evidence submitted by Guizhou. Guizhou claims that the verification reports allowed Commerce officials to trace the reported value of the inputs through the company accounts and verify that the GOC detected certain inputs were sold into the local market by Guizhou and Guizhou paid the duties for these inputs. Verification Report at 11, Ex. VE-11a. But again, while Commerce is required to "fairly request" data from interested parties, it possesses the discretion to determine whether the respondent has fully complied with an information request, *Helmerich & Payne, Inc. v. United States*, 22 CIT 928, 931, 24 F. Supp. 2d 304, 308 (1998), and has "considerable discretion in deciding whether a party has sufficiently replied to an information request."

*Mannesmannrohren-Werke AG v. United States*, 23 CIT 826, 849, 77 F. Supp. 2d 1302, 1321

(1999).

All in all, Commerce's review of the record evidence was reasonable and its decision to

countervail the Processing Trade Program is supported by substantial evidence that the court will

not now disturb.

## **CONCLUSION**

The court sustains the Department's decision to countervail the Processing Trade

Program.  The court also sustains the Department's Tier 1 benchmark calculations to measure the

adequacy of remuneration for natural and synthetic rubber, and Tier 2 benchmarks for carbon

black and nylon card, despite Guizhou's argument that the benchmarks did not reflect prevailing

market conditions in China.  However, the Department's decision to apply AFA regarding

China's Export-Import Bank Buyer's Credit Program was unreasonable because Commerce

reached unsupported findings as to missing material information and verifiability.  Additionally,

the Department is ordered on remand to reconsider and explain fully how it came to its distortion

findings for the synthetic rubber market—specifically, as it diverges from its opposite findings in

the 2014 Administrative Review.

For the foregoing reasons, after careful review of all papers, it is hereby

**ORDERED** that the Department's decision to apply AFA as to the PRC's Export
Buyer's Credit Program based on an alleged lack of cooperation was unlawful because
Commerce demonstrated no gap in the record, the respondents submitted evidence of non-use of
the Program, and the Department's findings of unverifiability of necessary information was
unsupported by record evidence; it is further

**ORDERED** that Commerce, on remand, reconsider its adverse inference that the PRC's
Export Buyer's Credit Program was used by Guizhou's customers and reach a new determination
on this issue based on findings supported by substantial record evidence; it is further

**ORDERED** that the Department reconsider its findings and upon reconsideration,
explain how the market for synthetic rubber in China changed between 2014 and 2015 and what

aspects of those changes caused Commerce to find that the market was not distorted in 2015; it is further

     **ORDERED** that all other challenged determinations of Commerce are sustained; and it is further;

     **ORDERED** that Commerce shall have ninety (90) days from the date of this Opinion and Order in which to file its redetermination, which shall comply with all directives in this Opinion and Order; that the Plaintiff shall have thirty (30) days from the filing of the redetermination in which to file comments thereon; and that the Defendant shall have thirty (30) days from the filing of Plaintiff's comments to file comments.

<u>/s/ Richard W. Goldberg</u>
Richard W. Goldberg
Senior Judge

Dated:  May 15, 2019
New York, New York